UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
JOHN HANCOCK LIFE INSURANCE
COMPANY OF NEW YORK,

                    Plaintiff,                                      **OPINION AND ORDER**

                 - against -                                 16-cv-7071 (NG) (JO)

SOLOMON BAUM IRREVOCABLE
FAMILY LIFE INSURANCE TRUST,
ABRAHAM HOSCHANDER, CHESKI BAUM,
and WELLS FARGO BANK, N.A.,

                    Defendants.
------------------------------------------------------------x
**GERSHON, United States District Judge:**

        This interpleader action involves competing claims for the $20 million death benefit of a life insurance policy (the "Policy") issued by plaintiff John Hancock Life Insurance Company ("John Hancock") on the life of Solomon Baum.[1] Current interpleader defendants are the Baum family trust (the "Trust"); Cheski Baum—son of Solomon Baum—in his personal capacity, as current Trustee of the Trust, and as executor of Solomon Baum's estate; and Wells Fargo Bank, N.A. ("Wells Fargo"). Abraham Hoschander, former Trustee of the Trust, was dismissed as a defendant following his resignation as Trustee. Dkt. No. 49. John Hancock, following its deposit of the death benefits with the Clerk of Court, was also dismissed. *Id.*

        On July 5, 2017, John Hancock filed an Amended Interpleader Complaint in light of Mr. Hoschander's resignation. Wells Fargo's Answer to the Amended Interpleader Complaint included two alternative claims for declaratory relief. The first seeks a declaration for distribution of all

---

[1] The court has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy exceeds $75,000.

Policy proceeds to Wells Fargo on the ground that the Trust sold the Policy to Wells Fargo in 2010. In the event it is not awarded the Policy proceeds, the second claim seeks distribution to Wells Fargo on unjust enrichment grounds.

Wells Fargo and Cheski Baum, in each of his capacities, now each move for summary judgment pursuant to Fed. R. Civ. P. 56. Cheski Baum's motion challenges the Policy's purported sale in 2010. He argues that good title to the Policy did not pass from the Trust to Wells Fargo because the signature of Mr. Hoschander, the Trustee at the time of sale, was forged on sale documents.[2] In opposition to Cheski Baum's motion, Wells Fargo asserts that, even if Mr. Hoschander's signature were falsified, Cheski Baum cannot establish forgery because he was complicit in the Policy's sale and any falsification of signatures was without an intent to defraud.

In its motion, Wells Fargo argues that I need not decide whether Cheski Baum was complicit in the Policy's sale because Wells Fargo is entitled to the Policy proceeds on numerous equitable grounds—among them, ratification and laches. I conclude that it is unnecessary to determine whether Mr. Hoschander's purported signature on the sale documents amounts to a forgery or to determine Cheski Baum's role, if any, in the Policy's sale because the undisputed facts establish that ratification and laches entitle Wells Fargo to the Policy's death benefits. I thus grant Wells Fargo's motion for summary judgment and deny Cheski Baum's motion.

I. Facts

The undisputed facts relevant to ratification and laches are described below. Other facts, including non-material disputes that do not pertain to these equitable doctrines, are described as

---

[2] Cheski Baum also points to other deficiencies in the relevant sale documents, including that his father's signature and the signature and stamp of the notary were false. However, because the Trust Agreement granted Mr. Hoschander exclusive authority to sell the Policy, it is Mr. Hoschander's signature that is the focus of this litigation.

2

necessary for clarity.

### A. Obtaining the Policy: The Plan

The Policy was solicited for the Baum family by Nathan Berger, a relative of the Baum family and employee of Signature Capital. Signature Capital was established by Herman Segal for the purpose of writing insurance policies. Deposition of Herman Segal ("Segal Dep.") at 21:3–5. Its business model involved writing life insurance policies on elderly people with their agreement and participation, enlisting investors or financing entities to pay premiums, and selling the policies after two years. *Id.* at 24:4–25:4. Families of the insured understood that they would not have to pay any money in premiums, *id.* at 102:18–21, and that they would "get some money in two or three years when the policy was sold, or if it was kept until maturity." *Id.* at 88:23–89:3.

Signature Capital executed its business model though a number of standardized practices. According to Mr. Segal, first, a trust was formed to own the policy, with an insured's family member designated as the trust's beneficiary. *Id.* at 52:4–18. Second, Mr. Segal and Mr. Berger understood that an insurer, such as John Hancock, would not issue policies to applicants who disclosed an intent to secure premium financing. *Id.* at 59:23–63:3. As a result, Mr. Segal and Mr. Berger shared an "unwritten code" not to disclose on the insurance application that premium financing would be obtained from outside sources. *Id.* at 62:4–7. Third, Signature Capital obtained an agreement from the insured and/or his family permitting the Policy to be sold after the end of a two-year contestability period included in the Policy. *Id.* at 248:21–249:10. Pursuant to this agreement, families would receive either 5% of the face value of the policy or 10% of the net profits upon the sale or maturation of the policy. *Id.* at 229:25–232:13; 249:11–250:4. There was no formal, written agreement codifying this arrangement; rather, the agreements were "a handshake type of thing," and very few insureds asked for a written agreement since they were not

obligated to finance any part of the arrangement. *Id.* at 53:7–54:10. In the end, "everyone would walk away happy." *Id.* at 24:18–21.

With respect to premium payments, Mr. Segal testified that Signature Capital's practice was for initial premium payments to be made from the commissions it received from the insurer for placement of the Policy. *Id.* at 71:22–73:4. The process worked as follows: Signature Capital or its agent would send the commissioned funds to the insured or his family member. The family would give the money to the trust that owned the policy, and the trust would make the premium payment from its own account to the insurance company. *Id.* at 77:5–78:20. Later-secured outside financing then reimbursed Signature Capital for the initial premiums and paid the remaining premiums on the Policy. *Id.* at 99:7–100:3.

The parties dispute whether the Baum family, and in particular Cheski Baum, understood that Signature Capital's standard practices applied to the purchase of the Policy. Cheski Baum contends that, though Mr. Segal and Mr. Berger may have had an internal understanding of Signature Capital's business model—including forming a trust to own a policy; securing outside financing; and ultimately selling the policy without the insured or his family ever having to pay premiums—such an understanding was never shared with him. Further discussion of this dispute, however, is unnecessary because it is immaterial to Wells Fargo's equitable arguments, which form the basis of its claim to the Policy's death benefit.

### B. Policy Application

On December 14, 2007, Solomon Baum and Abraham Hoschander executed the Solomon Baum Irrevocable Family Life Insurance Trust Agreement establishing the Trust. Mr. Hoschander was appointed Trustee of the Trust, and Cheski Baum was named sole beneficiary of the Trust. On December 20, 2007, a formal application for life insurance was submitted to John Hancock listing

4

Solomon Baum as the proposed insured and the Trust as owner and beneficiary of the Policy. Ex. M to Sawicki Decl. ("Policy App."). The application was signed by Solomon Baum, listed the source of the Policy's funding as Solomon Baum's "personal resources," and stated that there was no understanding or agreement by which a party other than the Trust would obtain any right, title, or other legal or beneficial interest in the Policy. *Id.* at 2. It also represented that Solomon Baum's household net worth was $38.2 million. *Id.* at 3. In fact, Solomon Baum did not have a net worth of $38.2 million dollars, and premium payments were never made from Solomon Baum's personal resources, as evident from the premium financing plan in which Signature Capital and the Trust participated soon after the Policy issued. Indeed, other parties provided premium payments and thus gained rights and/or interests in the Policy. On January 22, 2008, John Hancock issued the Policy to the Trust on the life of Solomon Baum, with a death benefit of $20 million.

### C. Policy Financing

Financial records indicate that premiums were paid largely in accordance with Signature Capital's business model. That is, the Policy's initial premiums—for February, May, and August 2008—were paid with Signature Capital's commissions, which had been received from John Hancock. Ex. R to Sawicki Decl. (reflecting February 2008 payment); Ex. GGGG to Sawicki Decl. (reflecting May 2008 payment); Ex. PPP to Sawicki Decl. (reflecting August 2008 payment). Outside financing funded subsequent premiums.

The Trust secured this outside financing in August 2008. It entered into a financing arrangement with H.M. Ruby Fund L.P. ("H.M. Ruby") for a loan in the amount of $1,871,406. Ex. W to Sawicki Decl. *Id.* at 2, 5.[3] Pursuant to the financing arrangement, the Trust granted H.M.

---

[3] Cheski Baum disputes the legality of this arrangement based on alleged forgeries of Solomon and Cheski Baum's signatures on the face of the agreement that codified the arrangement. Baum Rule 56.1 Counterstmt. ¶¶ 71, 72. However, Cheski Baum does not dispute that such a financing

5

Ruby a security interest in the Policy, *id.* at 6–7, in direct contravention of its representation in the Policy application that no outside party would obtain a legal or beneficial interest in the Policy. *Id.* at 6–7. Policy App. at 2.

On August 29, 2008, H.M. Ruby deposited the funds into the Trust's account. Ex. PPP to Sawicki Decl. at 1. About two weeks later, on September 2, 2008, the Trust paid $851,000 to Omega Venture Capital, an entity owned by Mr. Segal. *Id.* at 3. It is undisputed that this $851,000 payment was reimbursement to Mr. Segal for his advancement of the initial premium payments. In October and December 2008, two additional premium payments totaling over $500,000 were made using the H.M. Ruby funds. Ex. IIII to Sawicki Decl.; Ex. JJJJ to Sawicki Decl.

No premium payments were needed in 2009 because the 2008 payments were sufficient to keep the Policy in force through the year. By January 2010, however, the Policy faced possible lapse. John Hancock issued a warning letter to Mr. Hoschander's office stating that the premium payments received to date were "insufficient to maintain coverage." Ex. KK to Sawicki Decl. at 1 (January 15, 2010 warning letter). Cheski Baum asserts that, although John Hancock may have sent the notice to Mr. Hoschander's office, Mr. Hoschander did not open the notice. Instead, Mr. Hoschander's practice was simply to forward Policy-related mail along to Mr. Segal. Deposition of Abraham Hoschander ("Hoschander Dep.") at 88:5–14.

In any event, the warning letter was heeded, as evidenced by the fact that on March 3, 2010, the Trust obtained a bridge loan from H.M. Ruby for $2,343,140 to pay premiums and avoid lapse. Two days later, H.M. Ruby deposited an additional $178,000 into the Trust account, Ex. KKKK

---

arrangement existed or that H.M. Ruby conveyed the funds to the Trust. Transcript of Oral Argument, Nov. 15, 2018, at 10:5–6.

to Sawicki Decl., and on March 10, 2010, the Trust used these funds to pay $177,950 in premiums. Ex. UU to Sawicki Decl.

In January 2010, a Signature Capital employee sent Cheski Baum an email attaching a medical summary for Solomon Baum. It was Signature Capital's standard practice to work with an insured's family to obtain updated medical records in preparation for sale of a policy. Segal Dep. at 109:22–110:18.

### D. Sale of Policy

In April 2010, the Policy faced another possible lapse. This time, however, outside financing was not sought, and steps were taken to sell the Policy. On May 25, 2010, Mr. Hoschander signed a letter requesting that John Hancock complete a Verification of Coverage form for the Policy. Ex. MM to Sawicki Decl. That same month, a broker approached Lotus Life LLC ("Lotus Life") to purchase the Policy. On June 1, 2010, Lotus Life received a Life Insurance Settlement Application formally soliciting its purchase of the Policy.

The next day, June 2, 2010, Mr. Hoschander received an email from Mr. Segal attaching a number of Lotus Life sale documents and requesting that Mr. Hoschander sign and fax the documents to a specified number along with a copy of his photo identification and social security card. Ex. NN to Sawicki Decl. (email from Mr. Segal to Mr. Hoschander); Ex. TT to Sawicki Decl. (attached sale documents). The parties agree that Mr. Hoschander did not sign these sale documents or authorize anyone to sign them, though he received the sale documents and did nothing to object to the planned sale. Wells Fargo also points to Mr. Hoschander's testimony that he knew at some point that the Policy was "all done" because he stopped getting mail associated with the Policy. Hoschander Dep. at 148:5–14. Specifically, Mr. Hoschander testified that he "assume[d] [Mr. Segal] had cashed out," *id.* at 148:16–18, and that, despite not receiving any more

7

Policy-related paperwork, he did nothing to communicate with the Baums about the Policy's status or to investigate the Policy status. *Id.* at 150:18–151:2.

On June 9, 2010, Lotus Life received a Life Settlement Agreement that appeared to have been executed by Mr. Hoschander and Solomon Baum on June 7, 2010. Ex. T to Sawicki Decl. The Life Settlement Agreement provided for the purchase of the Policy for $2,449,802. *Id.* at 2. Cheski Baum disputes the extent of due diligence conducted by Lotus Life on the Policy, but does not dispute that, among the due diligence documents in its possession was a copy of Abraham Hoschander's driver's license.

There is no dispute that at no point did Lotus Life receive a request from the Trust, or anyone else, to rescind the Life Settlement Agreement. On July 16, 2010, John Hancock listed—at Lotus Life's behest—Wells Fargo as owner of record and beneficiary of record of the Policy. Since being listed as owner of record, Wells Fargo has served as securities intermediary and record owner of the Policy for each of its subsequent beneficial owners.[4] That same day, Lotus Life paid H.M. Ruby $2,399,802 to pay off the Trust's outstanding loan for H.M. Ruby's premium financing and various sale fees. Ex. RRR to Sawicki Decl. (authorization of transfer of funds to H.M. Ruby). About a month later, at Lotus Life's instruction, a $50,000 check was issued to the Trust. Ex. SS to Sawicki Decl. ($50,000 check paid to the order of the Trust).

While the parties agree that Mr. Hoschander's signature on the Life Settlement Agreement was false, there are two immaterial disputes surrounding the purported sale of the Policy.

First, Wells Fargo claims that, following Lotus Life's receipt of the Life Settlement Agreement, Lotus Life sent the Trust a letter via certified mail notifying the Trust that it had fifteen

---

[4] Cheski Baum disputes whether Wells Fargo initially took title of the Policy in its capacity as securities intermediary, but does not dispute that Wells Fargo has acted as securities intermediary for the Policy since 2010.

days to rescind the Life Settlement Agreement. Cheski Baum claims this letter was never mailed, and the Trust thus never had an opportunity to rescind the purported sale.

The parties also dispute whether the Trust received $50,000 from the sale of the Policy. Wells Fargo points to email correspondence in which Lotus Life directed that a check in that amount be issued to the Trust, as well as a copy of the check itself. According to Cheski Baum, such a check may have been issued, but the Trust never received the money.

Importantly, neither of the above-described disputes is material to Wells Fargo's equitable arguments. Moreover, there is no dispute that, either before or after the purported 2010 sale of the Policy, neither the Trust nor the Baum family ever paid any premiums to maintain the Policy.

### E.     Further Sales, Death of Solomon Baum, and this Litigation

From the time Wells Fargo became the Policy's owner of record in July 2010 until Solomon Baum's death in July 2016, John Hancock communicated solely with Wells Fargo regarding the Policy. The Policy then underwent a series of title transfers until two entities called LSH CO and LSH II CO (collectively, "LSH") purchased the Policy in March 2012 for $2,411,520. Declaration of Robert D. White, Chief Operating Officer of CMG Life Services, Inc. ("White Decl.") ¶¶ 14–20. The Baum Policy was sourced for LSH by CMG Life Services, Inc. ("CMG"), which also managed the Policy on behalf of LSH after its purchase. White Decl. ¶¶ 10, 21–22. Wells Fargo, however, continued to serve as securities intermediary for the Policy.

On September 3, 2015, CMG sent Solomon Baum a letter attaching the agreement pursuant to which it purchased the Policy and requesting Solomon Baum's compliance with certain medical information requests with which he was obligated to comply under the agreement. Ex. XXX to Sawicki Decl. (letter from CMG to Solomon Baum). The letter explained that Solomon Baum had "sold/surrendered [the] life insurance policy . . . issued by John Hancock Life Insurance Company

9

NY in the face amount of $20,000,000." *Id.* In October 2015, a Policy servicer communicated with Cheski Baum regarding the Policy "previously sold" and attached a health information disclosure form to be completed by Solomon Baum. Ex. EE to Sawicki Decl. (email communication between servicer and Cheski Baum). Prompted by the servicer, Cheski Baum requested and received copies of the sale documents that Solomon Baum purportedly signed. *Id.* at 4. The parties dispute whether Cheski Baum then told the servicer that his father's signature on the 2010 Life Settlement Agreement was false. Cheski Baum claims he did, but, according to Wells Fargo, CMG has no record of such a report. White Decl. ¶¶ 23–24. After receiving the sale documents, Cheski Baum did not investigate the ownership of the Policy; took no steps to verify whether the Policy had in fact been sold; did not contact Mr. Hoschander or John Hancock; and did not find out whether or how premiums had been paid. Deposition of Cheski Baum ("Baum Dep.") at 123:11–14; 124:15–24; 127:2–8; 241:9–23.

Solomon Baum died on July 29, 2016, and Cheski Baum was named the executor of his estate. On August 15, 2016, John Hancock sent a letter to Wells Fargo informing it of Solomon Baum's death and confirming that Wells Fargo was the beneficiary of the Policy. Ex. DDD to Sawicki Decl. Later that month, Cheski Baum sent John Hancock a Claim for Death Benefits form, completed with the help of Mr. Segal. Ex. AA to Sawicki Decl.; Baum Dep. at 195:14–196:15. In the form, Cheski Baum purported to be trustee of the Trust, although it is now undisputed that Mr. Hoschander remained the Trustee until May 2, 2017, and Cheski Baum became Trustee on May 12, 2017. Transcript of Oral Argument ("Oral Arg. Tr."), Nov. 15, 2018, at 7:5–14. About two weeks after Cheski Baum submitted his claim for death benefits, Wells Fargo submitted its claim. Ex. EEE to Sawicki Decl. Faced with competing claims, John Hancock filed the Interpleader Complaint, and this litigation ensued.

## II. Summary Judgment Standard

A party is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Only disputes relating to material facts—*i.e.*, "facts that might affect the outcome of the suit under the governing law"—will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the nonmoving party must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Ind. Co., LTD. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

In determining whether to grant summary judgment, the court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010). However, "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson*, 477 U.S. at 252.

## III. Analysis

Wells Fargo and Cheski Baum now each move for summary judgment. Cheski Baum claims ownership of the Policy—and its $20 million death benefit—on the ground that signatures on the Life Settlement Agreement were forged and thus good title to the Policy did not pass from

the Trust to Wells Fargo. Wells Fargo responds that Cheski Baum cannot prove forgery and that, in any event, equitable principles preclude the Trust from receiving the Policy proceeds even if the Life Settlement Agreement's false signatures were forged.

In New York, forgery is a species of fraud. *See Piedra v. Vanover*, 174 A.D.2d 191, 192 (2d Dep't 1992). An action to set aside a contract for fraud is equitable, *id.* at 194, and thus subject to equitable defenses. Wells Fargo asserts four equitable defenses—ratification, laches, equitable estoppel, and unclean hands—which it argues entitle it to the Policy's proceeds. I consider the first two of these defenses, and having found them supported by undisputed facts, decline to consider the latter two.

### A. Ratification

Ratification is a waiver of existing rights. *In re Levy*, 69 A.D.3d 630, 632 (2d Dep't 2010). "When a party with full knowledge, or with sufficient notice of his rights and of all the material facts, freely does what amounts to a recognition or adoption of a contract or transaction as existing, or acts in a manner inconsistent with its repudiation, and so as to affect or interfere with the relations and situation of the parties, he acquiesces in and assents to it and is equitably estopped from impeaching it, although it was originally void or voidable." *Rothschild v. Title Guarantee & Tr. Co.*, 204 N.Y. 458, 464 (N.Y. 1912).

Assent must be clearly established and may not be inferred from doubtful or equivocal acts, but acquiescence or silence can give rise to an inference of ratification. *Cammeby's Mgmt. Co., LLC v. Alliant Ins. Servs., Inc.*, 720 F. App'x 18, 22 (2d Cir. 2017). Thus, ratification may be implied when a party fails to repudiate, or retains the benefit of, an unauthorized transaction when he knows of the material facts concerning the agreement. *Hempstead Realty, LLC v. Sturrup*, 2017 WL 2215747, *6 (Sup. Ct. Nassau County 2017). Both void and voidable contracts and

instruments may be ratified. *Rothschild*, 204 N.Y. 458 at 464; *Hempstead Realty, LLC*, 2017 WL 2215747 at *6.

Despite disputes as to some immaterial facts in this case, the undisputed material facts before me establish that the conduct of Mr. Hoschander, Trustee of the Trust at the time of the Policy's purported sale and until May 2017, impliedly ratified the Life Settlement Agreement. The Trust's retention of benefits from the sale also serve as ratification of the Life Settlement Agreement.

1. **Failure to Repudiate**

As an initial matter, Cheski Baum does not—and cannot—dispute that at the time of the 2010 transaction, the Trust agreement gave Mr. Hoschander full authority to sell the Policy.[5] Further, Cheski Baum does not dispute that Mr. Hoschander received the Life Settlement Agreement in June 2010 when Mr. Segal emailed him the Policy sale documents and asked him to sign the paperwork and send a copy of his photo identification. Ex. NN to Sawicki Decl. (email from Mr. Segal to Mr. Hoschander). Instead, Cheski Baum attempts to explain this email away by arguing that Mr. Hoschander did not know what the Policy sale documents were when he received them; would not have even looked at the documents unless directed by Mr. Segal to do so; and in any event, never authorized anyone to sign his name on Policy documents. Hoschander Dep. at 145:9–20; 214:22–215:2.

This argument betrays a fundamental misunderstanding of the doctrine of ratification implied by conduct. First, it fails to account for the fact that a copy of Mr. Hoschander's driver's license was among the due diligence documents in Lotus Life's possession, indicating that at some

---

[5] The Trust agreement states that the Trustee is "exclusively empowered" . . . to "hold and retain all . . . property received from any source[,] . . . [t]o sell or otherwise dispose of trust assets, . . . [and to] buy assets of any type." Ex. N to Sawicki Decl.at WF_Baum_03195–06.

13

point Mr. Hoschander complied with Mr. Segal's request to send identification in connection with the sale. Second, this argument ignores Mr. Hoschander's testimony that he "would have signed" the Life Settlement Agreement without "study[ing] it." *Id.* at 125:8–126:11.

Most strikingly, Cheski Baum overlooks that Mr. Hoschander did nothing to repudiate the sale. As Trustee, Mr. Hoschander was accustomed to receiving Policy mail and notices. *Id.* at 106:23–107:24. This stream of correspondence—which persisted for two years, from the Policy's issuance in 2008 until 2010—abruptly stopped when the Policy was sold, and Mr. Hoschander *admitted* that he took this to mean that the Policy was "all done." *Id.* at 148:11. Yet Mr. Hoschander did nothing to find out if the Policy was still in force, *id.* at 150:2–151:2, because by that time, he "assume[d] [Mr. Segal] must have cashed out." *Id.* at 148:5–17. "At that point," Mr. Hoschander testified, "I had forgot[ten] about [the policies] already." *Id.* at 151:2–3. In fact, the Trust *never* attempted to repudiate the sale of the Policy until Cheski Baum filed a claim for death benefits in August 2016—less than a month after his father's death and six years after the purported sale.

Mr. Hoschander's inaction despite being aware of the Policy's sale amounts to ratification of it. *Prudential Ins. Co. of Am. v. BMC Indus., Inc.*, 630 F. Supp. 1298, 1302 (S.D.N.Y. 1986) ("In adjudicating the issues of ratification, the key factors are whether a party silently acquiesced in the contract or rather promptly interposed his objections upon discovering the basis for the claim of rescission."). *Hempstead Realty, LLC*, 2017 WL 2215747 at *8 (trust beneficiaries ratified unauthorized sale of trust asset where they failed to set aside sale and recover asset for five years); *Banque Nationale de Paris v. 1567 Broadway Ownership Assocs.*, 214 A.D.2d 359, 361 (1st Dep't 1995) (ratification barred defendant-appellants from withdrawing assent to forged mortgage-modification where defendant-appellants waited "two years before seeking to repudiate their contractual commitments . . . after enjoy[ing] the financial benefits of the modification"); *cf.*

*Cammeby's Mgmt. Co., LLC v. Alliant Ins. Servs., Inc.*, 720 F. App'x 18, 22 (2d Cir. 2017) (jury verdict that insured did not ratify reduction in insurance coverage upheld where jury was presented with competing evidence of knowledge).[6]

## 2. Retention of Benefits

Critically, the Trust also ratified the Life Settlement Agreement by accepting its benefits. Although Cheski Baum disputes that the Trust received $50,000 in connection with the Policy's sale, these proceeds are not the sum total of the Life Settlement Agreement's benefits to the Trust. It is undisputed that as part of the Policy's sale, Lotus Life paid $2,399,802 to H.M. Ruby to satisfy the Trust's outstanding loan obligation and various sale fees.

Cheski Baum challenges the validity of the Trust's financing agreement with H.M. Ruby, arguing that it too contained the forged signatures of both Solomon and Cheski Baum, though acknowledging the authenticity of Mr. Hoschander's signature. Oral Arg. Tr. at 11:4–8. But just as the Trust ratified the Life Settlement agreement, it also ratified the financing agreement. By virtue of the financing agreement, H.M. Ruby paid the Trust over $1.4 million in premiums to maintain the Policy, allowing the Trust to enjoy the Policy's protection for two years without paying a single premium. Ex. IIII to Sawicki Decl. at 1 (reflecting October 2008 premium payment); Ex. JJJJ (reflecting December 2008 premium payment); Ex. PPP to Sawicki Decl. at 1

---

[6] Cheski Baum also argues that Wells Fargo did not conduct adequate due diligence on the Policy despite being aware that the Policy was possibly "infected" with a stranger-originated-life-insurance ("STOLI") scheme. "STOLI" is the practice whereby a life insurance policy is procured for the intended benefit of a person who, at the time of procurement, has no insurable interest in the life of the insured. N.Y. Ins. Law § 7815(a). *See generally Kramer v. Phoenix Life Ins. Co.*, 15 N.Y.3d 539 (N.Y. 2010). Wells Fargo's due diligence practices are immaterial to the key question of whether Mr. Hoschander ratified the sale of the Policy. Because of Mr. Hoschander's ratification, Wells Fargo is entitled to the Policy death benefits *even assuming* deficiencies in the sale such as forged signatures or less-than thorough due diligence practices.

(reimbursement to Mr. Segal for February, May, and August 2008 premium payments). Had H.M. Ruby not paid these premiums, the Policy would have lapsed, and the death benefit being litigated in this case would not be available.

The Trust's acceptance of H.M. Ruby's premium financing thus amounts to implied ratification of the financing agreement, and its acceptance of Lotus Life's repayment of this financing amounts to implied ratification of the Life Settlement Agreement. *BAC Home Loans Servicing, LP v. Uvino*, 155 A.D.3d 1155, 1157 (3d Dep't 2017) (defendant would be deemed to have adopted mortgage note, even if forged, based on retention of its benefits); *Johnson v. Johnson*, 191 A.D.2d 257, 257 (1st Dep't 1993) (defendant's acceptance of the benefit of plaintiff's performance under the parties' agreement ratified the agreement and prevented defendant from challenging its validity).

B. **Laches**

"Laches is defined as such neglect or omission to assert a right as, taken in conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity." *Schulz v. State*, 81 N.Y.2d 336, 348 (N.Y. 1993) (internal quotations omitted). The essential element of this equitable defense is delay prejudicial to the opposing party. *Id.*

Cheski Baum argues that Wells Fargo cannot establish laches because, in October 2015, upon being told by a Policy servicer that the Policy had previously been sold, Cheski Baum informed the servicer that Solomon Baum's signature on the Life Settlement Agreement was false. Wells Fargo responds that there is no record of Cheski Baum raising such a red flag, and, even if there were, after he received confirmation of the Policy's sale, Cheski Baum took no steps to

determine who owned the Policy and did not otherwise contact either Mr. Hoschander or John Hancock as to the purported forgery.

Even accepting that Cheski Baum notified the Policy servicer that his father's signature on the Life Settlement Agreement was false, it is undisputed that he then fell entirely silent as to the Policy until after his father died nearly a year later—in July 2016. Moreover, Cheski Baum's assertion that he "should be forgiven for assuming that the issue was taken care of" is meritless. Baum Mem. of Law in Opp. at 13. Cheski Baum fails to explain *why* he should be forgiven for failing to take any action to pursue his purported rights. More importantly, he fails to address the substantial prejudice that Wells Fargo incurred as a result of his delay. Between Cheski Baum's alleged notification of forgery and his claim for death benefits, Wells Fargo paid thousands of dollars in premiums to John Hancock and expended significant administrative costs to maintain the Policy. Further, Solomon Baum's death resulted in a loss of substantial evidence that would have been crucial to Wells Fargo in defending its ownership of the Policy. *Schultz*, 81 N.Y.2d at 348 ("Delays of even under a year have been held sufficient to establish laches."); *Bailey v. Chernoff*, 45 A.D.3d 1113, 1115 (3d Dep't 2007); *Finn v. Morgan Island Estates*, 283 A.D. 1105, 1106 (2d Dep't 1954) (five-month delay constitutes laches bar). I thus find that laches bars Cheski Baum's claim to the Policy proceeds.

## IV. Conclusion

For the reasons set forth above, I grant Wells Fargo's motion for summary judgment declaring that Wells Fargo is entitled to the Policy proceeds on the grounds of ratification of the sale of the Policy and laches. Cheski Baum's motion for partial summary judgment is denied.

The Clerk of Court is directed to release the funds from the Court Registry Investment System ("CRIS") and disburse all funds, with interest, to Wells Fargo.

**SO ORDERED.**

s/Nina Gershon
_____
**NINA GERSHON**
**United States District Judge**

November 26, 2018
Brooklyn, New York